UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ARNOLD D. NEFF,

        Plaintiff,

        v.

        Case No. 2:11-cv-960
        JUDGE EDMUND A. SARGUS, JR.
        Magistrate Judge Terence P. Kemp

ALERIS ROLLED PRODUCTS, INC.,

        Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 17) and Defendant's Motion to Strike Portions of Plaintiff's Declaration (Doc. No. 24). For the reasons that follow, the Court **DENIES** both motions.

## I. BACKGROUND

On October 26, 2011, Plaintiff, Arnold D. Neff, filed this age discrimination case against his previous employer, Defendant Aleris Rolled Products, Inc. Plaintiff was 61 years old on February 5, 2010, when he was terminated for violating a safety rule and replaced by someone ten years younger. He was employed by Defendant for 38 years and was the oldest supervisor at Defendant's Ashville, Ohio plant.

Defendant manufactures and supplies aluminum home-building products. Plaintiff was hired by Defendant on January 13, 1972, as an assembly line worker. Plaintiff worked his way up in the business from a helper, to an operator, to a supervisor, a position he held for the last twenty years of his employment.

By all accounts, Plaintiff is a very skilled, conscientious employee and an excellent supervisor. The last work review offered by the parties was performed on February 6, 2008. In

that yearly review, Plaintiff was given an overall rating of "Exceeds Expectations," with his manager commenting: "Arnold has vast knowledge of machinery, and has been training all our department's maintainers. He is a problem solver and I have relied on his experience and knowledge extensively." (Performance Review, Doc. No. 22-6 at 4.) Plaintiff received several other "Exceeds Expectations" ratings, including in the areas of "Integrity, Ethics & Accountability," "Relentless Drive for Improvement," "Sense of Urgency," "Leadership," and "Versatility," with comments from his manager as follows:

> Arnold is very safety conscious, and encourages others to work safe. He is accountable and willingly takes on more responsibilities.
>
> He has a will to achieve and is unafraid of risk, often suggesting best methods of operation and is willing to try new things to improve productivity, and quality.
>
> He resolves issues quickly and efficiently.
>
> He is highly skilled in [the versatility] area, offering up his knowledge and experience in many areas.
>
> Arnold is a strong leader, motivates well and pushes shift to meet higher levels of performance.

*Id.* at 3.

Several months after this review, Dale Childress became Defendant's Manufacturing Manger. In that position, Manager Childress supervised five mangers, including Plaintiff. Childress is eight years younger than Plaintiff. Very shortly after Childress became Plaintiff's manager, he asked Plaintiff when he planned to retire. (Childress Dep. at 106–07, Doc. No. 20-2.) Childress does not know how many times he asked Plaintiff about retirement, testifying at his deposition that it "could have been three [times], could have been ten, [he doesn't] know." *Id.* at 107. Childress does not dispute that the last time he asked about retirement was within a month

2

of the time Plaintiff was terminated. Childress also commented to Plaintiff in a discussion about the production line work that Plaintiff "was set in [his] ways" and that the production line is "not like it used to be back 10 or 15 years ago, . . . times ha[ve] changed now and you've got to change with it." (Pl. Dep. at 177; Doc. No. 19 at 46.)

In June 2009, Manager Childress disciplined Plaintiff for allegedly operating a production line with three, instead of four, workers and then for alleged retaliation against the coworker who informed management of the line problem. Plaintiff disputes the facts upon which the discipline was taken and posits that Childress was starting a paper trail to support Plaintiff's termination.

The incident that caused Plaintiff to be terminated occurred when Line 61 was being "changed over" from one product to RDCR 19280 ("DCR 19"), another product. A line changeover is typically performed by "maintainers," who change the tooling and dies and make necessary modifications and adjustments to the machinery, including the safety guards. After the changeover, the operators and their helpers are responsible for running the production line. On Line 61, the safety guards were bolted in place.

Defendant produces DCR 19 once or twice a year in very small quantities. Plaintiff had never supervised its production. The production moved from another of Defendant's facility to the Ashville plant and was normally performed on a shift that did not involve Plaintiff. In December 2009, DCR 19 was produced at the Ashville plant by Kevin J. Iles, who ran the production line without any safety guards. (Iles Decl., Doc. No. 22-11.)

On February 2, 2010, Adam Conley and Dave Weaver, who are maintainers, were assigned to perform the changeover to DCR 19 on Line 61. Plaintiff was their supervisor. Once the changeover was complete, the finished product came out defective. This defect occurred

3

because the front guard did not leave enough room for the product to pass through. Weaver called Plaintiff to the line to view the defective product. Plaintiff instructed Weaver to raise the guard, which Weaver explained was not possible because of the location of the bolt holes. Plaintiff then instructed Weaver to raise the guard and use a clamp to hold it in place.

Weaver and Conley did not follow Plaintiff's direction, and instead, Conley requested that the line operator, Tyler DePugh, bring Kevin Iles to the line. Manager Childress had previously informed Conley to obtain any needed help with DCR 19 production from Iles. Conley avers that he felt he had too much work to complete in one day, and "being that [he] wanted to go home, and [Childress] had referred to [Iles] twice, on two separate occasions" related to DCR 19 production help, Conley asked DePugh to bring Iles to the line. (Iles Decl., Doc. No. 22-11.) Iles came to Line 61, observed the problem and informed Conley that DCR 19 "has always been ran with the guards off." *Id.* Conley took off the safety guards and ran the production of DCR 19.

Nick McDonald, a maintenance technician, observed that Line 61 was operating without safety guards. He instructed Operator DePugh to shut down the line and inform his supervisor, Plaintiff, that there were no guards on the line. DePugh went to Plaintiff's office and said "Nick McDonald told me to come up here and ask you whether you want me to run the line that way," to which Plaintiff replied "yes." (Pl. Dep. at 139.) Plaintiff testified that he assumed DePugh was referring to running the line with the guard raised and clamped, rather than fully bolted. Plaintiff had no knowledge that Conley had completely removed the guards. Plaintiff also told DePugh that if the OSHA inspector, who was at the Ashville plant that day, came near to move to another line. Plaintiff was concerned that the inspector would see the guard clamped and

4

question DePugh about it.

The next morning, Manager Childress interviewed Plaintiff about the incident. Union representative Anthony Klapec also attended the meeting. Plaintiff denied giving DePugh orders to operate the line without a guard and indicated that he had directed Conley and Weaver to c-clamp the guard on.

Two days later, Manager Childress issued to Plaintiff a "Safety Violation Memo," indicating that Plaintiff was suspended without pay pending investigation of the February 2, 2010 incident in which he "instructed [DePugh] to operate the line without the guards and, if the OSHA inspector came by, to shut the line down and move to another line." (Memorandum, Doc. 22-17.) The memorandum was signed by Childress, Human Resources Manager Robert Polca, and Plant Manager Steve Kosusko.

Thereafter, Manager Childress, HR Manager Polca, and Plant Manager Kosusko conducted an investigation of the incident. They interviewed Plaintiff, Operator DePugh, Union Official Klapac, Union Vice President Joe Piacentini, Helpers Bev Pierce and Mary Stevens, and Supervisors Chris Hughes and Bowman Harvey. Childress interviewed Pierce because he believed that she worked on Line 61 on the day in question. Pierce informed him that she was not on that line and that Mary Stevens was on it. Stevens indicated in the interview that she understood that the only way to operate the line was without the guards in place. Klapec indicated that Neff admitted that he made a bad decision to have Weaver reposition and clamp the guards. Hughes, a supervisor who reports to Childress, and Harvey, a manager from another of Defendant's facilities both informed the interviewer that they told DePugh not to run the line

5

without guards.[1]

     Manager Childress and HR Manager Polca did not interview Weaver or Conley, who were the maintainers who ran Line 61 and removed the safety guards, nor did they interview Iles, who informed Weaver and Conley that it was the consistent practice to produce DCR 19 on a line without guards.  Childress testifed that within days of the incident, "the rumor started flying where Kevin Iles had made a statement that [DCR 19] had been run every time without a guard." (Childress Dep. at 83, 84.)  Childress also testifies that during the investigation, he discovered that approximately seven weeks prior to the incident for which Plaintiff was terminated, on two separate occasions, Iles did in fact run the production of DCR 19 without guards.  Iles was not disciplined in any way for producing DCR 19 on a line without guards.

     Manager Childress, HR Manager Polca, and Plant Manager Kosusko determined that Plaintiff had operated Line 61 without guards, which is a Level 4 safety violation.  Level 4 safety violations are the most severe violations and are terminable offenses.  Childress does not recall specifically, but testified that he probably recommended Neff's termination to these two managers.  Together the three managers "came to the opinion that [Plaintiff's] employment needed to be terminated." (Childress Dep. at 100, 102.)  As part of the discussions leading up to the decision to terminate Plaintiff, Childress considered Plaintiff's 38 years of service, "but at the end of the day with the seriousness of the incident that transpired [his service] didn't have enough weight to over-ride a terminable offense." *Id.* at 103–04.

---

[1]The Court has not been provided with information on the content of the interview with Pacentini.

without guards.[1]

Manager Childress and HR Manager Polca did not interview Weaver or Conley, who were the maintainers who ran Line 61 and removed the safety guards, nor did they interview Iles, who informed Weaver and Conley that it was the consistent practice to produce DCR 19 on a line without guards. Childress testifed that within days of the incident, "the rumor started flying where Kevin Iles had made a statement that [DCR 19] had been run every time without a guard." (Childress Dep. at 83, 84.) Childress also testifies that during the investigation, he discovered that approximately seven weeks prior to the incident for which Plaintiff was terminated, on two separate occasions, Iles did in fact run the production of DCR 19 without guards. Iles was not disciplined in any way for producing DCR 19 on a line without guards.

Manager Childress, HR Manager Polca, and Plant Manager Kosusko determined that Plaintiff had operated Line 61 without guards, which is a Level 4 safety violation. Level 4 safety violations are the most severe violations and are terminable offenses. Childress does not recall specifically, but testified that he probably recommended Neff's termination to these two managers. Together the three managers "came to the opinion that [Plaintiff's] employment needed to be terminated." (Childress Dep. at 100, 102.) As part of the discussions leading up to the decision to terminate Plaintiff, Childress considered Plaintiff's 38 years of service, "but at the end of the day with the seriousness of the incident that transpired [his service] didn't have enough weight to over-ride a terminable offense." *Id.* at 103–04.

---

[1]The Court has not been provided with information on the content of the interview with Pacentini.

## II. MOTION TO STRIKE

Plaintiff submitted a declaration with his memorandum in opposition to Defendant's Motion for Summary Judgment. Defendant has moved to strike portions of that declaration from the record.

### A. Standard

There is no Federal Civil Rule that provides a vehicle to strike declarations or portions of declarations from the record. As opposed to striking declarations or affidavits from the record, the better practice is for the Court to disregard any inadmissible evidence offered in them. *See Fox v. Mich. State Police Dep't.*, 173 F. App'x 372, 375 (6th Cir. 2006) (explaining that the Federal Civil Rules "do not require the district court to remove documents other than pleadings from the record in a case" and that the documents may appropriately be dealt with on grounds of admissibility); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 599 (S.D. Ohio 2003) ("a court may disregard inadmissible evidence instead of 'striking' it from the record").

### B. Analysis

Defendant moves to strike Paragraphs 23 and 38 from Plaintiff's Declaration, arguing that Plaintiff is attempting to create a genuine issue of material fact by offering these statements, which contradict his earlier deposition testimony. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.").

Paragraph 23 of Plaintiff's declaration states, "Soon after Dale Childress became Manufacturing Manager in 2008, he began asking me when I intended to retire. He repeated the

7

question so often, I became suspicious." (Childress Decl. ¶ 23, Doc. No. 21-1 at 2.)  Defendant

contends that Plaintiff's deposition testimony directly contradicts this averment.  Defendant

points to Plaintiff's deposition testimony, in which he stated that Childress asked him when he

was going to retire on only three occasions in late 2009 and early 2010.  (Pl. Dep. at 177.)

Plaintiff responds that Defendant ignores the context and questioning sequence that

elicited his statements during the deposition.  The sequence of testimony is as follows:

> Q. You have alleged that you believe that your termination was due to your age, is
> that correct?
>
> A. Yes.
>
> Q. When did you first come to believe that?
>
> A. When Dale asked me in 2009, November before I went on vacation, he asked me
> a couple of different times when I was going on vacation—or when I was going to
> retire, and then when I came back off of vacation he asked me again when I was
> going to retire.  And then there were a couple of times that me and him talked about
> things or the way things should be ran in the department, and he made a comment
> that you're set in your ways, that it's not like it used to be back 10 or 15 years ago,
> he said times has changed now and you've got to change with it.
>
> Q. So how many times do you think Dale asked you when you were going to retire?
>
> A. Three times.
>
> Q. Two in November of 2009 and once when you came back from vacation?
>
> A. Yes.

(Pl. Dep. at 176–77.)

Plaintiff asserts that when he was asked "So how many times do you think Dale asked

you when you were going to retire," he was referring to his deposition testimony he had just

given about when he first came to believe that he was being discriminated against because of his

age. Plaintiff's assertion is well taken.

The context of the testimony reveals that Plaintiff was speaking only to the question of when he first became suspicious that Manager Childress wanted to terminate him because of his age. Moreover, even Manager Childress testified that he believes he first asked Plaintiff about retirement shortly after he became his manager at the end of 2008:

> Q. Did you ever ask Mr. Neff when he was going to retire?
> . . . .
>
> A. . . . I asked him at the -- I think it was somewhere right when I first become his manager [at the end of 2008]. . . .

(Childress Dep. at 107.)  Therefore, other evidence in the record also supports Plaintiff's position.

As to Paragraph 38, it provides:  "I never ordered Tyler DePugh to switch to another line if the OSHA inspector came around."  (Pl. Decl. at ¶ 38.)  Plaintiff admits that this paragraph appears to contradict his deposition testimony and offers a clarification.  Plaintiff contends that he averred that he did not "order" DePugh to switch to another line in response to evidence submitted by Defendant that DePugh was concerned about violating a supervisor's direct orders.  Plaintiff posits that "[h]e did not mean to imply that he did not tell DePugh to switch to another line."  (Pl. Mem. in Opp. Def. Mot. to Strike at 4, Doc. No. 25.)  Plaintiff continues, to him "this was a normal conversation and not a confrontation where he was threatening or otherwise trying to intimidate a subordinate.  When paragraphs 36, 37 and 38 are read together, they are meant to clarify the demeanor and tone of the conversation – *to wit* that Neff did not 'order' DePugh to do anything."  *Id.*  Therefore, Plaintiff admits that he told DePugh to move to another line if the OSHA inspector came by and there is no need for the Court to disregard any evidence related to

9

Paragraph 38.

### III. SUMMARY JUDGMENT

Plaintiff alleges age discrimination under the the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) and the Ohio Revised Code Chapter 4112.

**A. Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie Power Prods., Inc.*, 328 F.3d at 873 (quoting *Anderson*, 477 U.S. at 248). *See also Matsushita Elec.*

10

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

## B. Analysis

The analysis on a claim under the ADEA applies equally to a claim under the Ohio Revised Code. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998); *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 177–78 (2004). The ADEA makes it unlawful for an employer to fail or refuse to hire, discharge, or discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1).

A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Whether a plaintiff proffers direct or indirect evidence, the burden of persuasion remains on ADEA plaintiffs to show "that age was the 'but-for' cause of their employer's adverse action." *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2351 n. 4 (2009). *See also Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009); *Davis v. Goodwill Indus.*, No. 23238, 2009 Ohio 6133, 2009 Ohio App. LEXIS 5147 (Ohio Ct. App. Nov. 20, 2009).

Defendant moves for summary judgment, arguing that Plaintiff has presented no direct evidence of age discrimination and that, even if he had, Defendant has offered a legitimate

11

nondiscriminatory reason for terminating him which he has not shown to be pretextual.

## 1. Direct Evidence

"Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). "The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of age, but also that the employer acted on that predisposition." *Hein v. All America Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000). "In light of the well-established rule on summary judgment that, when viewing the factual evidence, [the Court] must draw all reasonable inferences in favor of [Plaintiff], the nonmoving party, all contested facts must be assumed in his favor. Furthermore, although direct evidence generally cannot be based on isolated and ambiguous remarks, . . ., when made by an individual with decision-making authority, such remarks become relevant in determining whether there is enough evidence to establish discrimination." *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004) (internal citation omitted).

In the instant action, the Court looks first to the comments made to Plaintiff by his direct supervisor, Manager Childress. The Sixth Circuit directs this Court to determine whether these comments show age bias by evaluation four factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002) (citing *Cooley v. Carmike*

12

*Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994)). None of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account. *Cooley*, 25 F.3d at 1330.

Defendant argues that Manager Childress' comments were vague, ambiguous, and isolated and that they were not related to the decision making process. Defendant relies on *Jones v. First Horizon Nat'l Corp.*, No. 09-2029, 2010 U.S. Dist. LEXIS 57082 (W.D. Tenn. June 9, 2010), a case it suggests is "directly on point." (Def. Mot. for Summ. J. at 14, Doc. No. 17-1 at 21.) In evaluating the four factors utilized in this circuit to evaluate statements allegedly showing an employer's age bias, the *Jones* court explained:

> The first and fourth factor clearly weigh in Plaintiff's favor: Sanders was the decision-maker who elected to eliminate Plaintiff's position and Sanders made the statement only two or three weeks prior to notifying Plaintiff of his termination.
>
> However, nothing in Sanders' comment related to the decision-making process for the reduction in force. Sanders inquired about Plaintiff's plans to retire and whether Plaintiff's wife was ready to retire and stated in parting that if he was as rich as Plaintiff, he would be walking out the door. Sanders never mentioned that he was forced to eliminate a MACs Project Manager position, that he was evaluating the MACs Project Managers to determine whose position should be eliminated, or that he had already made a choice about who was going to lose their job. While it is undisputed that Sanders had this conversation with Plaintiff just prior to eliminating Plaintiff's position, nothing in his comments to Plaintiff suggests that Plaintiff was being eliminated because of his age or that Sanders harbored any discriminatory animus on the basis of age towards Plaintiff.
>
> For the same reasons, it cannot be said that Sanders' comments were more than merely vague, ambiguous or isolated remarks. Sanders never referred to age generally, to Plaintiff's age specifically, or how Plaintiff's age affected his ability to perform his job duties. Rather the comments were addressed to Plaintiff's plans for retirement.

*Jones*, 2010 U.S. Dist. LEXIS 57082, at *23–24.

Here too the first and fourth factors clearly weigh in Plaintiff's favor: Manager Childress

13

was the decision-maker in Plaintiff's termination and the statements were made numerous times, the last being within one month of the termination. Also similar to *Jones*, the statements were not made during the decision-making process, which favors Defendant.

However, unlike in *Jones*, this Court cannot say that Childress' comments were merely vague, ambiguous or isolated remarks. Unlike the manager in *Jones* who never referred to age generally, to the plaintiff's age specifically, or how the plaintiff's age affected his ability to perform his job duties, Childress' comments, viewed in the light most favorable to Plaintiff, reflect on how his age effected his ability to perform his job. When discussing Plaintiff's production line work, Childress commented to him that he was "too set in his ways" and that "things are not the same as they were 10 or 15 years ago." (Pl. Dep. at 177.) While the Court recognizes that none of Childress' comments is inherently indicative of age animus, when they are considered within the totality of the circumstances here, they raise questions as to Defendant's true motivation for terminating Plaintiff. Of particular relevance is Defendant's decision to ignore entirely the same Level 4 safety violation committed by Kevin Iles just seven weeks prior to Plaintiff's violation.

Childress admits that he discovered during the investigation of Plaintiff's Level 4 violation that Iles had produced DCR 19 without any safety guards on the line approximately seven weeks before. And, although Plaintiff admits that c-clamping the guards on may have been questionable, it was by all accounts much less severe an infraction than running the line purposefully with no guards. Childress, however, testified that the offense was so serious in Plaintiff's case as to override what even Defendant agrees is an outstanding 38-year employment record. Yet Iles was not disciplined in any way.

14

Not only was Iles not disciplined, he was not even interviewed related to his direction to

Conley to remove the guards on Line 61, the offense for which Plaintiff was terminated.  Nor

was Conley, the employee who admittedly removed the guards without permission from Plaintiff,

interviewed.

The evidence before the Court is not so one-sided that Defendant must prevail as a matter

of law.  When viewing it in the light most favorable to Plaintiff, and drawing a justifiable

inferences in his favor, the evidence is such that a reasonable jury could find that Defendant was

predisposed to discriminate on the basis of age and that it acted on that predisposition.

### 2. Circumstantial Evidence

Indirect evidence does not on its face establish discriminatory animus, but allows the

factfinder to draw the reasonable inference that discrimination occurred.  *Kline v. Tenn. Valley*

*Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).  If a plaintiff relies on indirect evidence, the

burden-shifting evidentiary framework of *McDonnell Douglas* applies.  *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802-804 (1973); *Ercegovitch v. Goodyear Tire & Rubber Co.*, 154

F.3d 344 (6th Cir. 1998) (applying burden-shifting analysis to age discrimination claim based on

indirect evidence).

Under this paradigm, the plaintiff must set forth a *prima facie* case of discrimination by

showing that 1) he is a member of a protected class; 2) he suffered an adverse employment

action; 3) he was qualified for the position lost; and 4) he was replaced by an individual outside

the protected class. *See Mitchell v. Toledo Hosp.*, 964 F.2d at 582.  Alternatively, a plaintiff may

establish the fourth element by showing that he was treated less favorably than a

similarly-situated individual outside the protected class. *Clayton v. Meijer, Inc.*, 281 F.3d 605,

15

610 (6th Cir. 2002). In an age-discrimination case, the fourth prong requires replacement by a "substantially" or "significantly" younger person, which may include an individual within the protected class. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313 (1996); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

If the plaintiff establishes a *prima facie* case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to plaintiff to produce sufficient evidence from which the jury may reasonably reject the employer's explanation as pretextual. The plaintiff must point to evidence showing that the stated reason was "false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007) (plaintiff must point to evidence that the "proffered reason was not the true reason for the employment decision").

Defendant does not dispute that Plaintiff can establish a *prima facie* case of age discrimination. Defendant offers Plaintiff's Level 4 safety violation as its legitimate nondiscriminatory reason for his termination, which satisfies Defendant's burden. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) ("the defendant need not *prove* a nondiscriminatory reason for" the adverse employment action taken against the plaintiff, "but need merely *articulate* a valid rationale") (emphasis in original). Defendant focuses its argument on its contention that Plaintiff has failed to raise any issue of material fact as to whether its decision to terminate him was a pretext, and that the real reason was age discrimination. This Court disagrees.

As it explained in detail *supra*, viewing in the light most favorable to Plaintiff, the

16

Childress' comments about retirement and Plaintiff's performance, Plaintiff's outstanding 38 year employment history, the problems that began after Childress became his manager, the investigation, and Defendant's decision not to discipline in any way another individual who engaged in the same Level 4 safety violation all combine to constitute sufficient evidence to prevent this Court from granting Defendant judgment as a matter of law. It is this same evidence that raises genuine issues of material fact as to whether Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff is a pretext for age discrimination.

In this regard, Defendant argues that "'as long as [it] has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.'" (Def. Reply at 11, Doc. No. 23 at 15) (citing *Sybrandt v. Home Depot*, 560 F.3d 553, 558-59 (6th Cir. 2009)). In assessing whether an employer holds such an honest belief, the key inquiry "is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Sybrandt*, 560 F.3d at 559 (quoting *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)). The employer's decision process need not be perfect, optimal, or "leave no stone unturned." *Id.* at 560.

In *Sybrandt*, the case upon which Defendant relies, the Sixth Circuit found that the plaintiff had failed to raise any genuine issue as to whether the employer, "Home Depot[,] held an honest belief that Sybrandt had violated company policy." *Id.* at 559. The court first determined that the investigation was reasonably informed, finding that "Home Depot engaged in a thorough investigation to determine whether Sybrandt's conduct was inappropriate." *Id.* The Court then explained the specifics of the investigation. The court next determined that "the

17

decision to discharge Sybrandt reflected a 'considered' judgment" because his manager had "consistently recommended the discharge of employees for" the same or similar conduct. The court specified that the plaintiff had "not produced any material countervailing evidence indicating that 'the process [Home Depot] used to conduct the investigation was irregular or idiosyncratic.'" *Id.* (citation omitted).

Unlike the circumstances before the *Sybrandt* court, here Plaintiff did produce countervailing evidence indicting that the investigation was irregular or idiosyncratic. Defendant received inconsistent evidence with regard to what Plaintiff actually directed his subordinates to do which was not followed up on. Instead, Defendant determined that Plaintiff's version of the facts was incorrect–an employee with a 38 year employment record and a history of being "very safe conscious, and encourag[ing] others to work safe." (Performance Review, Doc. No. 22-6 at 4.) Indeed, Plaintiff did not even interview all of the individuals who were involved in the incident. Also dissimilar to *Sybrandt*, Defendant here did not consistently recommend discharge for employees who engaged in similar conduct.

Accordingly, the Court finds that Plaintiff has raised genuine issues of material fact as to whether Defendant held an honest belief in its proffered nondiscriminatory reason for discharging him. Thus, Plaintiff has met his burden of producing sufficient evidence from which a jury may reasonably reject Defendant's explanation as pretextual; that its reason for terminating him was "false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

## IV. CONCLUSION

18

For the reasons set forth above, the Court **DENIES** Defendant's Motion for Summary Judgment (Doc. No. 17) and **DENIES** Defendant's Motion to Strike Portions of Plaintiff's Declaration (Doc. No. 24).

   **IT IS SO ORDERED.**

_____6 -10 -2013_____                    _____
**DATE**                                 EDMUND A. SARGUS, JR.
                                         **UNITED STATES DISTRICT JUDGE**

19